STATE v. DONALD GEORGE DeFOE.

169 N. W. (2d) 404.

July 11, 1969—No. 41069.

*C. Paul Jones,* State Public Defender, and *Robert E. Oliphant,* Assistant State Public Defender, for appellant.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Otis, Rogosheske, Sheran, and Peterson, JJ.

PETERSON, JUSTICE.

Defendant appeals from his conviction for aggravated robbery, Minn. St. 609.245. He contends that the evidence is insufficient to sustain the conviction, particularly because his identification by the robbery victim and his implication by an alleged accomplice were unreliable; and he further contends that court-appointed counsel represented him inadequately.

These claims should be considered in the circumstantial setting of the robbery. On September 22, 1966, at about 1 a. m., defendant was with Kenneth Hill and Gerald Michalec, his alleged accomplices, in Michalec's black two-door Chevrolet, which was parked near a service station at Fry and Selby Avenues in St. Paul. Defendant "knew [Hill and Michalec] a little bit, not too good." His relationship with Hill apparently was not particularly cordial, for defendant had allegedly dated Hill's girl friend while Hill was serving time in the St. Paul workhouse. Nevertheless, the three drank a few cans of beer together, which defendant had in a bag, and they later went to the nearby apartment of defendant's sister to get more, after which they apparently returned to Michalec's automobile.

At about 3 a. m. two St. Paul police officers stopped by the vehicle because they observed it parked near business establishments and facing in the opposite direction from that which an automobile traveling on that side of Fry normally would face. The occupants identified themselves to the officers as defendant, Hill, and Michalec. They stated that "their engine had vapor-locked," but they started the car up immediately when the officers, after some 15 minutes, told them to depart. The officers at that time noted a pair of gray leather work gloves on the front seat of the automobile, and defendant admitted that the gloves belonged to him. The police officers recalled that defendant was wearing a short light-colored jacket or white shirt and dark trousers.

At approximately 4:30 a. m. that same morning, three men entered a Superamerica gas station at 2501 Hennepin Avenue, Minneapolis, where Gregg Matthew Headrick was the attendant. After lingering in the station for approximately 15 minutes, ostensibly to buy pop, two of the visitors went outside the station and the third, identified by Headrick as the defendant, produced a gun and demanded that Headrick give him the money "or he'd let [Headrick] have it." Headrick thought that the weapon was a handgun, but it was held under the robber's jacket so that only the barrel was clearly visible. At that point the other two re-entered the station and the three took the bills and two or three rolls of coins, totaling about $40. They then fled west from the service station in an automobile described by Headrick to the police as a 1955 or 1956 Chevrolet or Oldsmobile.

A Minneapolis police car in the vicinity of the service station responded quickly when Headrick telephoned the police department immediately after the robbery. Headrick informed the police that the robbers were three young men, "[p]ossibly Indian or Mexican," "wearing levi type clothes," and "in the early twenties," and that one of them was armed. Headrick also described their automobile and direction of flight. Officers in another squad car in the vicinity of 28th Street and East Lake of the Isles Boulevard, having received a radio alert, observed a 1956 black Chevrolet with three occupants turn onto Lake of the Isles Boulevard at about 25th Street, which is only a short distance from the scene of the robbery. The Chevrolet was moving slowly north on the boulevard, but as the squad car came up behind it, its driver made a turn onto Humboldt Avenue and accelerated to 50 or 60 miles per hour, with the police in pursuit. After an evasive series of right turns, the driver of the Chevrolet drove onto the front lawn of a residence at 2020 Girard Avenue South. Two of the occupants fled on foot, but Hill was found lying in the back seat. The police apparently observed at that time that the occupants were of Indian race. A search of the automobile disclosed three empty beer cans, "a

sawed-off .22 caliber rifle" under the dashboard, rolls of nickels and a roll of pennies under the front seat, and $17 in bills under the rear seat. A pair of gray leather work gloves, like those earlier observed by the St. Paul police in Michalec's automobile, were on the front seat.

1. Hill testified as a witness for the state at the trial of defendant. The jury was aware that he had himself pleaded guilty to simple robbery prior to testifying against defendant.[1] He testified that he, Michalec, and defendant had met about midnight on September 22 and had driven around in Michalec's automobile "[raising] a little hell." After being stopped by the St. Paul police, he testified, the trio drove to Minneapolis and committed this robbery. He testified also that defendant had "pulled the gun" in the robbery.[2] Hill's testimony, as an accomplice, was in our view amply corroborated by other independent evidence, direct and circumstantial, that tended to convict defendant of the crime. The possible ill will between defendant and Hill raised only an issue of credibility for the jury.

2. Headrick, as a witness for the state, unhesitatingly and positively identified defendant both at the preliminary hearing and the trial as the man who, wearing a tan jacket, robbed him at gun point. His identification, to be sure, was more positive than it was immediately after the robbery with respect to defendant's clothing and police photograph.[3] When shown photographs in the office of the county attorney, Headrick had picked

---

[1] Michalec had similarly pleaded guilty to simple robbery, but did not testify.

[2] Although defendant was convicted of aggravated robbery, the sentence imposed upon him was that provided for simple robbery, as in the case of Hill and Michalec.

[3] He had originally told the police that defendant had "a blemish of some type." Although defendant asserts that his face was not blemished, the record is silent as to this characteristic. Assuming that his face bore no blemish at trial, we do not view this as crucial in view of the probability that such condition might well have disappeared in the intervening months.

out the photograph of someone other than defendant. But among the photographs viewed by Headrick he had taken particular note, too, of defendant's photograph, one taken some years before this 1966 event. Considering the changed age of this young defendant and the limitations of such photographic likenesses, we do not view this circumstance as destroying the credibility of Headrick's in-person identification at trial. Discrepancy in description of the trousers worn by defendant is likewise not crucial under all the circumstances. There can be no question that Headrick had ample opportunity and facility to observe defendant in person at the time of the crime and at the subsequent trial confrontation so as to give reasonable reliability to the identification.

3. Defendant claims that his court-appointed counsel was inadequate because he did not cross-examine the state's prime witness with sufficient vigor and because he failed to call one Melvin King as an alibi witness. His counsel was an able lawyer, experienced in criminal defense work. His alleged limitation in cross-examination was doubtlessly a matter of considered trial tactics, rather than want of either competence or dedication. His decision not to call Melvin King as an alibi witness was, as in-chambers discussion discloses, dictated by professional judgment, for, after an interview with King, he concluded that King "could not help us in the defense of this case, and conceivably could do some harm." Defendant himself, upon inquiry by the court at that time, concurred in his counsel's judgment.

The evidence, direct and circumstantial, overwhelmingly supports the verdict of guilty, a verdict which competent counsel could hardly by any honorable means have prevented. At the time of sentencing defendant told the court: "There was a chance that I done this. I never had no intention of it. I mean, I'm not a criminal, that's all."

Affirmed.